## COMMONWEALTH *vs.* PETER YORK.

When, on the trial of an indictment for murder, the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious, and an act of murder, and proof of matter of excuse or extenuation lies on the defendant. WILDE, J. dissenting.

THE defendant was indicted for the murder of James Norton. His counse, at the trial, attempted to show that his

offence was manslaughter. The evidence at the trial, so far as it relates to the questions of law hereinafter discussed, is stated in the opinion of the majority of the court, as given by the chief justice. After the case was committed to the jury, with instructions from the court, and they had been in consultation several hours, they sent to the court this question: "Were the jury instructed by the court, that the prisoner must prove provocation or mutual combat, and was not to have the benefit of any doubts on the subject?" To this question the court gave the following answer: "It is hardly possible to give a direct answer, affirmative or negative, to the question of the jury, without some explanation. The rule of law is, when the fact of killing is proved to have been committed by the accused, and nothing further is shown, the presumption of law is that it is malicious, and an act of murder. It follows, therefore, that in such cases the proof of matter of excuse or extenuation lies on the accused; and this may appear, either from evidence adduced by the prosecution, or evidence offered by the defendant. But where there is any evidence tending to show excuse or extenuation, it is for the jury to draw the proper inferences of fact from the whole evidence, and decide the fact on which the excuse or extenuation depends, according to the preponderance of evidence. Where there is evidence on both sides, it is hardly possible to imagine a case in which there will not be a preponderance of proof on one side or the other. But if the case, on the evidence, should be *in equilibrio*, the presumption of innocence will turn the scale in favor of the accused; that is, in a case like the present, in favor of the lesser offence. But if the evidence, in the opinion of the jury, does not leave the case equally balanced, then it is to be decided according to its preponderance."

The jury found the defendant guilty of murder, and his counsel moved for a new trial, on the ground that the jury were misdirected.

*R. H. Dana, Jr.* for the defendant. A killing may be criminal or not criminal; and if criminal, it may be murder

or manslaughter. From the mere act of killing, there is no presumption in nature, or from experience, that it is murder rather than manslaughter. Of all the homicides that are committed, few are found to be murders. A presumption of murder, from the mere fact of killing, is therefore contrary to reason and experience, as well as against liberty and life ; and it should not be enforced without the clearest proof of its unavoidable obligation upon the court.

The question now before the court respects the burden of proof. The jury were satisfied that the prisoner killed the deceased. They were not satisfied that he killed him of malice. In this state of mind, they asked the court for the rule of law. If the court had ruled that the malicious killing was a single proposition, of the truth of which the jury must be satisfied beyond a reasonable doubt, the verdict would have been for manslaughter. But the court separated the proposition into two parts, the killing and the malice, and instructed the jury, in effect, that malice need not be proved, but was to be inferred, by a technical presumption, from the killing, and that the burden of proof was shifted upon the prisoner to disprove it. This burden was indeed lightened by requiring him to produce only a preponderance of belief, or an equilibrium, in favor of his defence. But this was ex gratiâ, and the principle is the same. The presumption was enforced, and the burden shifted upon the prisoner.

Burke says, " civil cases regard property. Now although property itself is not, yet almost every thing concerning property, and all its modifications, is, of artificial contrivance. The legislator therefore always, the jurist frequently, may ordain certain methods by which alone they will suffer such matters to be shown and established ; because their very essence, for the greater part, depends on the arbitrary conven· tions of men. They make fictions of law, and presumptions of law, according to their ideas of utility. But where the subject is of a moral nature, independent of their connexions, men have no other reasonable authority than to register and digest the results of experience and observation. The pre-

sumptions, that belong to criminal cases, are those natural and popular presumptions, which are only observations turned into maxims." This distinction between artificial and natural presumptions is recognized by the text writers ; and the former are nowhere applied to criminal cases. Best on Presumptions, 18, 43, 208, 308. Wills on Circumstantial Ev. 29.

The presumption, in the present case, is purely artificial and technical. No fact can be added, like that of using a deadly weapon ; for the ruling was, that the mere fact of killing supports the presumption. Nor is it a presumption of criminality only, which the law raises ; for there is no doubt of the criminality of the act. The only question is as to the degree; and it is here that the law is supposed to enforce a presumption of the greater degree of guilt, rather than the less.

Suppose the jury had returned a special verdict, viz. that the prisoner killed the deceased, and that the killing was criminal, but that they had reasonable doubts whether it was malicious ; could the court have entered a judgment of guilty of murder? Yet such would be the legal effect of that finding, if the doctrine of the instructions be true.

The jury were not allowed to be judges even of the facts. A fact was given to them, with an artificial weight attached to it by law, which they were not at liberty to disregard They were required to draw an inference from it, which, in their judgments, as reasoning and observing men, they never would have drawn. They do not draw it now. The law draws it. The prisoner has not had what he is entitled to, namely, the unbiassed moral conviction of the jury that he is guilty of murder.

By the instructions given to the jury, their verdict was made to depend, not upon their convictions, but upon the burden of proof, which is governed by technical rules. If a reasonable doubt arises as to the fact of killing, the identity of person, an *alibi*, or the like, the prisoner has the benefit of it. But if it arises as to the malicious intent, which is the gist of the charge, he is to be convicted of malice, whether it be or be not supported by proof, unless he rebuts the charge. But it

has always been held, in this Commonwealth, that in criminal trials the burden of proof never shifts. *Commonwealth* v. *Kimball,* 24 Pick. 373. *Commonwealth* v. *Dana,* 2 Met. 340

It will be contended, in behalf of the government, that though, as a general rule, the burden of proof does not shift in criminal cases, and though a defendant is entitled to the benefit of every reasonable doubt, yet that there is an exception in the case of homicide. And the text books contain loose language that imports such an anomaly. But it is not found in any decision of a court. The history of the law of homicide accounts for the rise and transmission of this language. At an early period, if the homicide was proved, a verdict of murder was returned; and if there were circumstances of excuse, a pardon was sued out. At a later period, the punishment of murder and manslaughter was the same. Both offences were equally clergyable, before the *St.* of 23 Hen. 8; and a distinction between them was hardly recognized. So far was this true, that the nature of the prisoner's intent needed not to be alleged in the indictment. But that statute inflicted death, without clergy, upon persons convicted of wilful murder with malice prepense. Even after the degree of punishment was altered, the verdict was always for murder, if there was a felonious homicide, with a recommendation of a commutation of punishment, if there was no sufficient proof of malice prepense. A separate verdict for manslaughter was new in Elizabeth's time. 4 Bl. Com. 201. Dyer, 261. When the verdict and the punishment were the same, there was no need of strictness in the distinctions. It was enough to know, that if the killing was proved, the party was to be convicted generally. Hence a criminal intent and a felonious intent were convertible terms; and so were murder and felonious homicide. Mr. Justice Story says, "malice, in the true sense of the law, at least in all cases except that of murder, signifies no more than a wilful intent to do a wrongful act. In cases of murder, there is an accompaniment, indicative of its being used in a more intense sense — 'malice aforethought.'" *United States* v. *Taylor,* 2 Sumner, 586. The

word malice, in all the earlier cases, meant no more than criminality. The *St.* of Hen. 8 recognizes degrees of criminality in homicides, and makes malice *prepense* the definition of murder, in contradistinction to simple malice, or mere criminality, wh'ch is equally predicable of manslaughter. This distinction has been gradually unfolded. The earlier cases use malice in the general sense. We have taken such instances and applied them to the new state of the law.

An argument against the instruction arises from the fact, that the court was obliged to make a new rule ; the rule of *preponderance* and *equilibrium.* These words are nowhere to be found in the criminal law, until introduced on the trial of Rogers. 7 Met. 500. See Best on Presumptions, 257. Even if the language of the text books is to be adhered to, and proof of the killing is held to throw the burden on the prisoner, what is that burden ? It is a prisoner's burden, the only burden ever put upon him by the law, that of satisfying the jury that there is a reasonable doubt of his guilt.

*S. D. Parker,* for the Commonwealth. The instruction to the jury was the same that was given in *Commonwealth* v. *Rogers,* 7 Met. 500 ; and the defendant was allowed the advantage of an equilibrium of proof, in a matter which he was bound to prove. This was more favorable to the defendant than is warranted by any case, except that of Rogers.

Generally, the rules of evidence are the same in criminal cases as in civil ; and in civil cases the burden is on the party who takes the affirmative. *Phelps* v. *Hartwell,* and *Blaney* v. *Sargeant,* 1 Mass. 71, 335. *Buckminster* v. *Perry,* 4 Mass. 593. *Phillips* v. *Ford,* 9 Pick. 39. *Loring* v. *Steineman,* 1 Met. 211. When a *primâ facie* case is made by a plaintiff, the burden of proof is shifted upon the defendant, and he must prove matter of avoidance. *Gray* v. *Gardner,* 17 Mass. 189. *Attleborough* v. *Middleborough,* 10 Pick. 378. *Davis* v. *Jenney,* 1 Met. 224. See also *Powers* v. *Russell,* 13 Pick. 76.

When the law presumes the affirmative, it lies on the party who denies the fact to prove the negative. 1 Stark. Ev. 380. And it has been he'd, for centuries, that when a homicide is

proved to have been committed, the law presumes it to have been malicious, and to be murder, until the contrary appears; that it is for the accused to show, satisfactorily, the circumstances which justify, extenuate or excuse, the act. 1 Hale P. C. 455. Foster's Crown Law, 255. Kelyng, 27. 1 Hawk. c. 31, § 32. 1 East P. C. 224, 340. 4 Bl. Com. 201. Roscoe Crim. Ev. (2d ed.) 20. *The King* v. *Oneby,* 2 Ld. Raym. 1493, and 2 Stra. 773. *Mitchell* v. *The State,* 5 Yerg. 340. This doctrine was laid down in the case of *Commonwealth* v. *Phillips,* tried in this court in 1817, as appears in a pamphlet report thereof, p. 45; also in *Commonwealth* v. *Knapp,* 10 Pick. 484. In *Commonwealth* v. *Dana,* 2 Met. 329, the same rule was applied in the case of a minor offence.

*G. W. Phillips,* in reply. The government is bound to prove the homicide, and that the defendant committed it, and that he did it maliciously. If there be any reasonable doubt on either point, the defendant is entitled to an acquittal of the charge of murder. Best on Presumptions, 267. This is clearly so, unless a presumption of law alters the case, and throws upon the defendant the burden of negativing the malice. But the counsel for the government has failed to produce a single *adjudication* that the burden is thus shifted. The *dicta* of judges and text writers, to this effect, are indeed numerous. But this was accounted for in the opening argument for the defendant, and may be further explained, by referring it to the arbitrary rules introduced by the Norman conqueror, and stated in Kelyng, 121–124, and 4 Bl. Com. 194. The case of *Commonwealth* v. *Dana,* 2 Met. 329, does not support the position taken for the government, but the contrary. It was there held that the burden of proof was not shifted. In *Commonwealth* v. *Rogers,* 7 Met. 500, the defence was insanity, and the presumption of sanity is warranted by all experience and observation. But the presumption of malice, in case of homicide, is not thus warranted. See opinions of the judges, in *The King* v. *Burdett,* 4 Barn. & Ald. 140, 149.

The opinion of a majority of the court was delivered by

SHAW, C. J   A motion has been submitted by the counsel

for the prisoner, after conviction, for a new trial, for a misdirection in point of law, in the instructions of the court to the jury. Such a motion is of rare occurrence; and as a capital trial is by law a trial before a full court, it cannot be considered as a matter of course, and if allowable at all, it must be on occasions of real difficulty and importance.

On the present trial, after the jury had retired to deliberate on their verdict, and had been some time in consultation, they requested a further instruction of the court; and the court, after a short deliberation, gave them instructions upon the point proposed. The court, although they took as much time for consideration as the circumstances of the case then admitted, had yet little time and opportunity for reflection and the examination of authorities, and were very willing to reconsider the subject, under the light which might be thrown upon it, by the arguments of counsel and the citation of authorities. We have had the aid of a full and able argument by learned counsel, and are now prepared to state the result. It is a subject of unfeigned regret, that on a question of this extreme delicacy and magnitude, the members of the court have not been able to come to a unanimous opinion. But after a repeated examination of authorities, and the fullest discussion and interchange of opinion, we have not been able to come to such a desirable result. It has become my duty to state the opinion of a majority of the court.

In order to the better understanding of the question put by the jury, and the instructions of the court given in answer thereto, it seems proper to state briefly the course of the trial and the questions in fact submitted to the jury.

The prisoner was indicted for the wilful murder of James Norton, on the night of the 2d of July 1844, between eleven and twelve o'clock. There was plenary evidence, tending to prove that the said Norton, at the time and place stated in the indictment, received a mortal wound by a dirk knife, the blade of which had penetrated his heart, and was found, on a *post mortem* examination, broken off in the body of the deceased; of which wound he almost instantly died; and that

this wound was inflicted by the hand of the prisoner. There was some evidence tending to show some struggle and contest between the parties, at or shortly before the time at which the mortal wound was given, and some conflicting evidence in regard to the fact and to the circumstances of such contest and struggle. The ground originally taken by the prisoner's counsel was, supposing the charge of killing to be proved, that the act was done in excusable self-defence, or, that if it was a culpable homicide, it was not done with malice, so as to make it murder, but done in heat of blood in mutual combat, or under such provocation as the law admits to be sufficient to extenuate the offence, and reduce it to manslaughter. The defence was ultimately placed mainly on the latter ground, and one of the questions submitted to the jury was, whether there existed such heat of blood in mutual combat, or such sufficient provocation, so as to reduce the homicide to manslaughter.

The question put by the jury, some time after they had withdrawn from the bar, and the answer thereto by the court, were thus: [Here the chief justice stated the question and the answer, as set forth, *ante*, p. 94.]

The motion for a new trial is made on the ground that this was a misdirection, and that the jury should have been instructed that, if there was sufficient evidence to raise a reasonable doubt, whether the homicide was malicious, or committed in heat of blood in mutual combat, or suddenly, upon adequate provocation, so as to extenuate it to manslaughter, then they should return a verdict of manslaughter. This is the question we are to consider.

In the first place, it is proper to consider what the nature of the homicide was, in the present case, to distinguish it from other species of homicide, and consider what was the nature and tendency of the evidence, upon which the instruction was prayed by the jury.

There may be cases of homicide, properly ruled murder by implied malice, when there was *no intention* to take the life of the deceased party; as where one wantonly throws timber

9 *

from a house into a street in a populous town, regardless of consequences; or where one feloniously shoots at tame fowls, with intent to steal them, and the ball accidentally hits a man and kills him; or where one wantonly suffers a wild beast to go at large; or where one rides an unruly horse into a crowd; or where a mother exposes her infant child in a garden, and it is killed by a kite; or where the overseers of different parishes shift a pauper infant child from one parish to the other, in a contest which shall support it, until it dies of cold and hunger; or where a son wantonly exposes his sick father to the cold, so that he dies; or where a woman places her child in a hog-sty, to secrete it, and it is destroyed. All these (and many more cases, mentioned in the books, might be named,) are cases where death ensues from acts done recklessly and wantonly, under circumstances of inhumanity and cruelty, indicating a heart devoid of social duty, and fatally bent on mischief. But as the question, whether such homicide be murder or manslaughter, must depend upon the degree of carelessness, cruelty or malignity, presented by the evidence, depending upon the particular facts and circumstances, the malice must be an inference of fact from these circumstances; and if thereby a reasonable doubt exists, upon the evidence, whether the fact of malice is proved, a jury may be properly instructed to return a verdict of manslaughter. But the case, to which the rule we are now considering applies, is one where the life of the deceased has been taken by the accused, by a voluntary act, a wound inflicted with great violence, with a deadly weapon, and upon a vital part.

The distinguishing characteristic of murder is homicide with malice aforethought, express, or implied by law. The effect of the rule presented to the jury was, that if it was proved, beyond reasonable doubt, that the defendant had wilfully and voluntarily inflicted a mortal wound upon the deceased, malice was to be inferred from this act, unless such facts were proved, by a preponderance of the evidence, as would extenuate the homicide and reduce it to manslaughter. This rule seems to rest on well settled principles, and to be supported by a great weight of authorities.

A sane man, a voluntary agent, acting upon motives, must be presumed to contemplate and intend the necessary, natural and probable consequences of his own acts. If, therefore, one voluntarily or wilfully does an act which has a direct tendency to destroy another's life, the natural and necessary conclusion from the act is, that he intended so to destroy such person's life. So, if the direct tendency of the wilful act is to do another some great bodily harm, and death in fact follows, as a natural and probable consequence of the act, it is presumed that he intended such consequence, and he must stand legally responsible for it. So, where a dangerous and deadly weapon is used, with violence, upon the person of another, as this has a direct tendency to destroy life, or do some great bodily harm to the person assailed, the intention to take life, or do him some great bodily harm, is a necessary conclusion from the act.

But, however suddenly any act is done, the intent to do it precedes the doing of it, and the act is done in pursuance of the intent and formed design. However short the interval, the intent necessarily precedes. This is manifest from the ordinary case of a mortal blow given, with a deadly weapon, immediately upon words of provocation. Words, however aggravating, not being considered a sufficient provocation to extenuate the offence to manslaughter, it is uniformly held to be murder, an act done with malice prepense ; and it is not the less preconceived, because the act immediately followed the guilty intent. There was obviously no intent to do the act of violence, until the provocation was offered ; and although it is said that the act of resentment follows *immediately,* yet such is the rapidity with which the mind operates and forms its purposes, and so instantaneously does the hand execute the purposes of the will, that the moment which intervenes is sufficient for the operation of the malignant motive. Otherwise, the suddenness of the mortal blow, on provocation however slight, must exclude the implication of malice. But the law, in such cases, does impute malice to the act, because it does not consider the weight of the provocation such as

naturally to arouse so violent a resentment; and as an act so violent and cruel cannot be attributed to a natural resentment, incident to the infirmity of human nature — on which ground alone it can extenuate the homicide — it is necessarily attributed to malignity of heart.

Malice, in the definition of murder, is imputed to an act done wilfully, *malo animo,* an act wrong in itself, injurious to another, and for which there is no apparent justification or excuse. Such justification or excuse must depend on the existence of facts; and such facts must be proved and found, in order to be the basis of any judicial decision. The wilful and voluntary act of destroying the life of another is an act wrong and unlawful in itself, injurious in the highest degree to the rights of another, being the greatest wrong which can be done to him, contrary to the laws of nature as well as society, and in violation of the plainest dictates of conscience. The natural and necessary conclusion and inference from such an act wilfully done, without apparent excuse, are, that it was done *malo animo,* in pursuance of a wrongful injurious purpose, *previously,* though perhaps suddenly, formed, and is therefore "a homicide with malice aforethought," which is the true definition of murder. And it appears to us, that this is not a forced, arbitrary, technical or artificial presumption of law, but a natural and necessary inference from the fact. This will be more apparent from considering what malice, in legal contemplation, is, and how it is inferred from illegal and wrongful acts, in other cases of crimes and offences of less magnitude.

Malice, although in its popular sense it means hatred, ill will or hostility to another, yet, in its legal sense, has a very different meaning, and characterizes all acts done with an evil disposition, a wrong and unlawful motive or purpose; the wilful doing of an injurious act without lawful excuse.

Mr. Justice Bayley, in giving the opinion of the court in *Bromage* v. *Prosser,* 4 Barn. & Cres. 255, though on a subject widely different from homicide, thus gives the legal description of malice, in contradistinction to the popular sense, in

which the term is commonly used: "Malice, in common acceptation, means ill will against a person; but in its legal sense it means, a wrongful act, done intentionally, without just cause or excuse. If I give a perfect stranger a blow likely to produce death, I do it of malice, because I do it intentionally and without just cause or excuse. If I maim cattle, without knowing whose they are, if I poison a fishery, without knowing the owner, I do it of malice, because it is a wrongful act and done intentionally. If I am arraigned of felony, and wilfully stand mute, I am said to do it of malice because it is intentional and without just cause or excuse." This is sometimes called malice in law, in contradistinction to malice in fact, because the law draws the inference from the fact. So, in civil actions, and prosecutions for minor offences some authorities in our own books, and in recent cases, illus trate this legal doctrine of malice. In *Wills* v. *Noyes,* 12 Pick. 324, the court charged the jury that legal malice might differ from malice in the common acceptation of the term; that to do a wrong or unlawful act, knowing it to be such, constituted legal malice. This was affirmed by the whole court, who say, that whatever is done, " with a wilful disregard of the rights of others, whether it be to compass some unlawful end, or some lawful end by unlawful means, constitutes legal malice." So, in a more recent case, *Commonwealth* v. *Snelling,* 15 Pick. 340, the court, after noticing the legal and popular meaning of the term "malice," say, "in a legal sense, any act done wilfully and purposely, to the prejudice and injury of another, which is unlawful, is, as against that person, malicious." See also Foster's Crown Law, 256; Russell on Crimes, (1st. ed.) 614, *note.*

These instances, taken from cases having no analogy to the crime of homicide, are adduced to show, that the presumption of malice, from a wrongful and injurious act wilfully done, when applied to homicide, is not technical, or artificial, or invented for the particular occasion, but is the result of a mode of legal reasoning which is of general application.

The same doctrin is laid down, as the undoubted law of

England, in a recent work of good authority, frequently re-published and in extensive use in this country ; 2 Stark. Ev. 903 ; in which the writer states the general doctrine I have been stating, that "malicious" imports nothing more than the wicked and perverse disposition with which the party commits the act ; and he illustrates the general proposition by a reference to this presumption of malice in the case of homicide.   His words are: "the application of the term 'malicious' is strongly illustrated in the case of homicide, where the *malus animus,* which brings the offence within the denomination of wilful murder, is frequently to be collected by the court, as a matter of law, from the circumstances of the case, and is not an inference of fact to be drawn by a jury, as it must necessarily be whenever malice consists in the *specific intention* actually existing in the mind of the agent, at the time of the act."   And it is remarkable that Mr. Greenleaf, whose recent treatise on evidence is to be regarded rather as a discussion and statement of the grounds and principles of the theory of proof in general, than as a detail of the rules of evidence, puts forth this same presumption of malice, not as an arbitrary or technical rule, but as a natural inference, drawn by a fair course of reasoning, from the laws of nature, the experienced course of human conduct and affairs, and the connexion usually found to exist between certain things, and, in this respect, standing upon the same footing as inferences from the known laws of nature.   He adds, "the general doctrines of presumptive evidence are not therefore peculiar to municipal law, but are shared by it in common with other departments of science.   Thus, the presumption of a malicious intent to kill, from the deliberate use of a deadly weapon, and the presumption of aquatic habits in an animal with webbed feet, belong to the same philosophy, differing only in the instance, and not in the principle of its application."   1 Greenl. on Ev. § 14.   He then distinguishes between those which are conclusive, and not capable of being rebutted by proof, and those which are disputable, and may be overcome by opposing proof.   Of the latter, the following

is the illustration: " Thus, on a charge of murder, malice is presumed from the fact of killing, unaccompanied with circumstances of extenuation ; and the burden of disproving the fact is thrown upon the accused." § 34.

I shall have occasion, hereafter, to state more fully that the term " deliberate," as used in the first of these passages, does not, in its legal acceptation, so much import an act done after time for reflection, as a voluntary act, an act done upon motive, of purpose and design, in contradistinction to acts done in the heat of passion, a paroxysm of resentment, in which reason and choice, for the moment, have no agency. The books constantly speak, in this connexion, of a deliberate act, *however sudden*. Whereas, if deliberation implied time and reflection, a deliberate act could never be sudden. So it has been held in Pennsylvania, under a statute which requires premeditation to constitute murder in the first degree, that the intention to kill, though immediately executed, is still the true criterion of the crime, and that the intention of the party can be collected only from his words and actions. *Respublica v. Mulatto Bob*, 4 Dall. 146. And in various other cases under the statute, it has been decided that, where it appears from the whole evidence that the crime was, *at the moment*, deliberately or intentionally executed, the killing is murder. It is sufficient, if the circumstances of wilfulness and *deliberation* are proved, though they arose and were generated at the period of the transaction. *Commonwealth* v. *Dougherty*, 1 Browne, Appx. xviii. *Pennsylvania* v. *M'Fall*, Addison, 257.

I will add a few other authorities, to show that the inference of malice from unlawful acts is not an artificial rule of law, but a natural inference, legitimately deduced from facts admitted or proved, and that it is not peculiar to the law of homicide, but prevails in all other departments of the criminal law. In *The King* v. *Dixon*, 3 M. & S. 11, the defendant was indicted for delivering bread, mixed with unwholesome and noxious materials, as good and wholesome bread, for the use of the children of the Royal Military Asylum at Chelsea. There was a motion in arrest, for the cause, among other

things, that the indictment did not show that the defendant intended to injure the children's health; whereupon Lord Ellenborough said " it was an universal principle, that when a man is charged with doing an act of which the probable consequence may be highly injurious, the intention is an inference of law resulting from the doing of the act, and here it was alleged that he delivered the loaves for the use and supply of the children." In *The King* v. *Philp*, 1 Mood. Cr. Cas. 263, the prisoner was charged with burning a ship of which he was part owner, the primary purpose being to defraud the underwriters. But the evidence not being produced to prove the fact of insurance, that intention was not proved. But there were counts charging the accused with burning the ship, of which he was also master, with an intent to injure the other part owners, and the case proceeded on them. It was argued by the counsel for the prisoner, that the intention to defraud his co-proprietors was not proved, but that a different intent was shown. But it was answered, and resolved by the court, that voluntarily setting fire to the ship, and destroying her, was a wilful act; that it tended to a destruction of the property of others; and that it was a necessary inference of law, that he intended to injure them. The case of *The King* v. *Farrington*, Russ. & Ry. 207, is to the same effect.

There is a very recent case to the same point, *The Queen* v. *Hill*, 8 Car. & P. 274. On the trial of an indictment, before Mr. Baron Alderson, the prisoner was charged with uttering a forged bill of exchange, with intent to defraud Samuel Minor. The counsel for the prisoner, in addressing the jury, submitted that, on the evidence, they ought to negative the intent to defraud, because there was evidence, as he contended, that the prisoner intended himself to take up the bill. The learned judge told the jury that the questions for them were, whether the defendant uttered the bill, as a true bill, to Minor, and whether, if he did so, he knew, when he did so, that it was forged; and he instructed them that, if they should find these two facts, then they ought to find, as a necessary

consequence of law, that the prisoner meant to defraud. "A man," said he, "must be taken to intend the consequences of his own acts, and must intend to defraud, if he pays another a false note instead of a real one." And this decision was affirmed by the fifteen judges. See also *The King* v. *Sheppard*, Russ. & Ry. 169.

That one shall be presumed to intend the natural consequences of his own acts, was decided in the remarkable case of *The King* v. *Woodburne & Coke*, in 1722, referred to in most of the books on crown law, and reported at large in 16 Howell's State Trials, 54. The indictment was founded on the Coventry act, charging the accused with lying in wait, and attacking Edward Crispe, with a sharp and heavy instrument called a bill, with intent to maim and disfigure him; and proof of this intent was necessary to bring the case within the act. The proof was, that they conspired to murder him; struck him repeated blows, with a hedge bill, in his face and on his head, by which his nose was slit; and left him for dead; but that he afterwards recovered. The ground taken by Coke was, that the act was done, not with an intent to disfigure, but to murder. But it was answered and resolved, that striking a man in the face with such a weapon, with an ultimate purpose of murdering him, had a direct tendency to maim and disfigure him, and therefore he must have intended that result; and he was convicted and executed.

I shall now consider the more direct question, whether the instruction to the jury, in the present case, was right and conformable to law. As a preliminary to this inquiry, we must first ask where we are to look for the governing rules and principles of law on this subject. The statute of the Commonwealth provides that murder shall be punished with death; and it prescribes a milder, but still a severe, punishment for manslaughter. But our statutes nowhere define murder or manslaughter. They do not declare what act shall constitute either of the offences, nor what acts of homicide shall be deemed justifiable or excusable. We are then obliged to seek for these rules and principles in the common law. Our Eng-

lish ancestors, on their first settlement of a colony here, as it has been significantly expressed, brought the common law with them, and claimed it as their birthright, so far as it was applicable to their state and condition. After the establishment of a new form of government, by the grant of the provincial charter, in 1692, one of the first acts of the new government was, to continue in force all the local laws made under the colonial government. And, as we continued to be English subjects, the laws of England, with some modifications, continued in force till the revolution. And by our present constitution, part 2, *c.* 6, art. 6, it is declared, that " all the laws which have heretofore been adopted, used and approved, in the province, colony or State of Massachusetts Bay, and usually practised on in the courts of law, shall still remain and be in full force, until altered or repealed by the legislature, such parts only excepted as are repugnant to the rights and liberties contained in this constitution." These provisions have effectually adopted the rules and principles of the common law of England, as the laws of this Commonwealth, so far as they are applicable to our condition, and given them an authoritative and binding force and effect. To this great storehouse of learning and intelligence we must resort, as well for the rules and principles of law, as for the precedents, forms and modes of practice, as they existed at the time of our revolution, and not since otherwise provided for by statute. As this is an unwritten law, we must seek for the evidence of it ir judicial records, precedents and decisions, and those digests, treatises and commentaries, of learned and experienced men, which have acquired respect and confidence by long usage and general consent. If we consult English decisions made since the revolution, it is not because they have any binding force as rules, but because they are expositions of the rules and principles of the common law, by men of great experience and judgment in the knowledge and application of the same laws which we are seeking to expound. And if we read the digests and treatises of reputable authors, published since we ceased to be English subjects, it is because they contain the

authentic records of the precedents and judicial proceedings, which furnish the evidence of the common law. In like manner, the decisions of courts of other States, having the same common origin, and deriving their laws from the same common source, are valuable and useful, in enabling us the more clearly to understand, and the more fitly to apply, the rules and principles of our own authoritative code of laws.

With these views of the sources of inquiry to which it is necessary to resort, I will proceed to the investigation. I will, in the first instance, cite the rule as laid down by Sir Michael Foster, an eminent judge of the highest court of criminal juris-. diction, many years before our revolution, when the people of Massachusetts were under English jurisdiction. He was also a most acute, discriminating and exact writer, whose chapter on the law of homicide has been a work of standard authority on that subject, for a century. Sir William Blackstone says of him, that he was a very great master of the common law. In a case of great public interest, in which a *habeas corpus* had issued from the court of king's bench, to obtain the discharge of the Lord Mayor of London, who had been committed to the tower of London, by the house of commons — a case involving critical questions in regard to the liberty of the subject and the power of the commons — Lord Chief Justice De Grey delivered his opinion, in which the other judges concurred, refusing to discharge the party and remanding him to the tower. On that occasion, citing, among others, the opinion of Mr. Justice Foster, in support of his opinion, he speaks of him as one " who may be truly called the *magna charta* of liberty of persons, as well as fortunes." 3 Wils. 203. His work was cited at large by the court, and apparently relied on, as authority for a very important point of law, in the case of *Commonwealth* v. *Knapp*, 9 Pick. 517.

The rule is thus stated in Foster's Crown Law, 255 : " In every charge of murder, *the fact of killing being first proved,* all the circumstances of accident, necessity or infirmity, are to be satisfactorily proved by the prisoner, unless they arise out of the evidence produced against him ; for the law presumeth

the fact to have been founded in malice, until the contrary appeareth. And very right it is that the law should so presume. The defendant, in this instance, standeth upon just the same ground that every other defendant doth ; the matters tending to justify, excuse or alleviate, must appear in evidence, *before he can avail himself of them.*"

As this was not a judicial opinion, given in the actual administration of justice, it may become necessary to trace it to an earlier source.

Lord Coke, in 3 Inst. 47, having described murder as homicide, " with malice forethought, either expressed by the party or implied by law," proceeds, in p. 51, thus to define malice prepensed : " Malice prepensed is when one compasseth to kill, wound or beat another, and doth it *sedato animo.* This is said in law to be malice forethought, *prepensed, malitia præcogitata.*" Here, perhaps, the same remark may be made on the word " *sedato* " which was before made on the word " deliberate ; " that it rather denotes an act done in pursuance of a motive, with an intent and formed design, in contradistinction to an act done in an ebullition of anger, in which reason and judgment are for the moment suspended. But whether or not this is the true meaning intended to be expressed by Lord Coke, I think it is made clear, by his definition of implied malice, on the next page. " First in respect of the manner of the deed. As, if one killeth another without any provocation of the part of him that is slain, the law implieth malice ; whereof you may read in *Mackalley's case,*" 9 Co. 67 *b.*

*Mackalley's case* was heard before all the judges, on a special verdict, on an indictment of several persons for the murder of a civil officer. Many points were considered and adjudged, and it is difficult, without making too large an extract, to state the exact point decided on this subject. But I understand it to be stated by Lord Coke, as decided by all the judges and barons, that " if one kills another without provocation, and *without any malice prepense which can be proved,* the law adjudges it murder, and implies malice ; for by the law of God every one ought to be in love and charity with

all men; and therefore, when he kills one without provocation the law implies malice, and he may be indicted generally, that he killed of malice prepense; for malice implied by law, given in evidence, is sufficient to maintain the general indictment." This case, decided in the reign of James I., on great consideration, by all the judges, appears clearly to decide the point, that if the *fact* of killing is proved, and on this proof o. the homicide no excuse or extenuation appears, no other proof of malice need be given; the malice is proved by the act, and a conviction of murder must necessarily follow. It is an act done *malo animo*, and without excuse or justification which can be proved.

In the above statement, the case of a killing without provocation is put. But I think it will manifestly appear, from a great variety of cases, that this is equivalent to saying, that it is where no provocation appeareth; where none is proved; on the well known rule, that facts alleged, but not proved, are considered, for all judicial purposes, as not existing. This is established by *Legg's case*, Kelyng, 27. One John Legg was indicted for the murder of Robert Wise. "It was upon the evidence agreed, that if one kill another, and no sudden quarrel appeareth, this is murder, as in *Mackalley's case*, 9 Co. 67 *b.* And it lieth on the party indicted to prove the sudden quarrel." This was affirmed in the leading case of *The King* v. *Oneby*, 2 Ld. Raym. 1485, and 2 Stra. 766. It was argued on a special verdict, before all the judges, in the year 1727, and their unanimous opinion was delivered by Lord Raymond, C. J. The case is too long to cite, but I will state several points decided, bearing upon the present question. On the subject of implied malice, it was held, that "killing a man, without a provocation, is murder; as if A. meets B. in the street and immediately runs him through with a sword, or knocks out his brains with a hammer or bottle." One objection to the verdict was, that the homicide was upon a sudden quarrel, and so but manslaughter; whereupon the court stated the rule thus: "In answer to this objection, I must first take notice, that where a man is killed, the law will not presume that it

10 *

was upon a sudden quarrel, unless it is proved to be ; and therefore in *Legg's case*, it was agreed upon evidence, that if A. kills B., and no sudden quarrel appears, it is murder; for it lies upon the party indicted to prove the sudden quarrel "

There is another view of the subject, which appears to me o lead strongly to the same conclusion. I allude to the cases of special verdicts and judgments thereon. It is a settled rule, and was so laid down in *Oneby's case*, to which all the judges agreed, that the court are judges of the malice, and not the jury ; and that the court are also judges of the facts found by the jury, whether, if the quarrel was sudden, there was time for passion to cool, or whether it was deliberate or not. It is an equally well settled rule, that if, upon all the facts, found and returned by the jury, in a special verdict, the accused may be not guilty, the court will take nothing by intendment, and are bound to pronounce him not guilty.

If the fact of killing did not necessarily imply malice, and exclude the inference of heat of blood on provocation or in mutual combat, then it would follow that, after the fact of killing is found, if the jury do not negative such fact of provocation or mutual combat, it would still be left equivocal, whether the homicide was upon malice or heat of blood, and the court could not render a judgment as for murder. But it is believed, that in *Mawgridge's case*, Kelyng, 119, and in *Oneby's*, and many other instances of special verdicts, the jury do not in terms find that the homicide was of malice, nor do they return, negatively, that there was no provocation or sudden quarrel. They return the facts ; of course, the *facts proved, and no others.* If, upon these facts, the court conclude that there was a homicide with malice, judgment is entered for murder; because, whether malicious or not is matter of law. So if, upon the verdict of the jury, no fact of provocation or sudden quarrel appears, it is because no such fact was proved to their satisfaction. The reason why the court are bound to render judgment for murder, when the verdict neither finds nor negatives the fact of provocation or sudden quarrel, is, that in the absence of proof of these facts, the law presumes

malice, from the act of killing, unless the matter of excuse or extenuation affirmatively appears; and unless it does so appear upon the proof in support of the provocation, it must be proved by the accused; otherwise it will not appear at all. It follows, therefore, that in such case, if the accused does not or cannot offer proof of such fact, satisfactory to the jury, his defence on that ground must fail. This is clearly stated by the court in *Oneby's case*, in 2 Ld. Raym. 1494, where the court say, "although there are many special verdicts in indictments for murder, there never was one where the jury find, in express terms, that the act was done with malice, or was not done with malice prepense, or that it was done upon a sudden quarrel and in transport of passion, or that the passion was cooled, or not cooled, or that the act was deliberate, or not deliberate; but the collection of those things from the facts found is left to the judgment of the court." *Hollowaye's case*, Palm. 545. Cro. Car. 131. W. Jon. 198. So in another passage in the same opinion, being a comment upon *Legg's case*, before cited, it is said, "if A. kills B., and no sudden quarrel appears, it is murder; for it lies on the party indicted to prove the sudden quarrel; and therefore the jury not having found any such thing for the prisoner's benefit, it is to be took there was no such."

From this view of the immemorial usage of the courts, upon special verdicts, it appears manifest that the fact of killing is *primâ facie* evidence of malice, and unless overcome by preponderating proof the other way, it must be held murder, and judgment go accordingly.

This view of the law of homicide, showing how a judgment must be rendered upon a special verdict which finds, in terms, neither the fact of malice nor the fact of provocation or sudden quarrel, (including, of course, the nature and incidents of such provocation or quarrel,) in extenuating the homicide, leads to the consideration of another part of the direction to the jury, excepted to by this motion. This direction was, that if, in their opinion, the proof preponderated against the conclusion that there was mutual combat, although they

might entertain some doubts, then the extenuation was not
proved.   The argument against this proposition is this, that
as it is a maxim of the criminal law, in favor of life, of inno-
cence, and of immunity from punishment, that the guilt of the
accused must be proved to the full satisfaction of a jury, and
if they have reasonable doubts on the subject, the defendant
ought to be acquitted; then if the proof of the fact of ex-
tenuation is such as to raise a reasonable doubt, whether there
was not such sudden quarrel as to extenuate the homicide,
the jury ought to find a verdict for the lesser offence ; other-
wise the defendant might be convicted of the higher offence,
whilst in fact the jury would have doubts whether he was
guilty of it.   This is putting the objection strongly, and it is
certainly entitled to a respectful consideration.   But we think
it is not well founded.   The maxim is certainly a humane
and a sound one, and constantly practised on, that guilt must
be proved beyond reasonable doubt.   In the language of that
humane judge, Lord Hale, *tutius semper est errare in acquie-
tando quam in puniendo; ex parte misericordiæ, quam ex parte
justitiæ.*   But we think the argument drawn from it, on this
occasion, is not valid.   It is the guilt of the accused, which is
to be proved to the satisfaction of the jury, and beyond reason-
able doubt.   Now if we are right in the main point, which
we have been endeavoring to establish, his guilt is proved by
proof of the act of voluntarily killing another, without excuse
or justification apparent upon the proof offered in support of
the prosecution.   Unless this fact is proved beyond reasonable
doubt, unquestionably the defendant is entitled to an acquittal.
But when this is proved beyond reasonable doubt, the guilt of
malicious homicide is proved beyond reasonable doubt, and the
humane maxim of law is not violated.   But it is in favor of
life and innocence, that this maxim of criminal law, in the
application of evidence, has been adopted ; and therefore it
was, that in the other branch of the instruction, the court
directed the jury to find for the prisoner, if, in their opinion,
the proof *preponderated* in favor of the fact of sudden and mu-
tual .ombat.   Proof beyond reasonable doubt is necessary to

establish a fact against the accused; but preponderating proof — proof sufficient to satisfy a jury of the fact — is sufficient to establish a fact in his favor. But it must go to this extent; otherwise there is nothing on which the jury can found their belief, and warrant them in considering the fact proved. It is not sufficient, therefore, to raise a doubt, even though it be a reasonable doubt of the fact of extenuation; simply because it is no *proof* of the fact. And here, again, we think the point may be illustrated by considering how the case would stand on a special verdict. Supposing the jury were to find, in the usual form, that the accused made the felonious assault on the deceased with a dangerous and deadly weapon, called a dirk knife, and therewith gave him one mortal wound, of which he instantly died, in manner and form, &c.; and should also return, that there was some evidence tending to prove that said wound was given in heat of blood, during a sudden and mutual combat; but that the proof of such fact did not preponderate over the proof against it, though it raised some doubt in their minds. It seems to us that it must be then considered that the matter of extenuation was not proved; and then, as in very many precedents, the judgment of the court must be against the prisoner, for the higher offence. And yet that would be precisely similar to the present case, with this difference, that, in this case, the jury were directed to draw the inference as they should find the fact upon the proof; whereas, in the case supposed, the inference would be drawn by the court, on the same state of the case on the record.

I am aware that Lord Holt, in his elaborate opinion, in *Mawgridge's case*, Kelyng, 119, in some introductory remarks, states the ancient law in regard to murder and homicide, in the time of the Danes, and afterwards of the Normans, in which certain arbitrary presumptions were, by express enactment, to be raised. Homicide was not then considered murder, unless it was secret. Among other extraordinary provisions, it is stated that, before the statute of Marlbridge, as the law stood or was interpreted, if a man was found to be

slain secretly, it was always intended, 1st, that he was a Frenchman; 2d, that he was killed by an Englishman; 3d, that the killing was murder; and 4th, that if any one was apprehended to be the murderer, he was to be tried by fire and water, (i. e. by ordeal,) though he killed him by misfortune; which was extended beyond reason and justice, in favor of the Normans. These are undoubtedly cases of mere arbitrary presumptions, for the security of despotic power, rather than the dictates of reason and justice. But they are mentioned rather as curious matters of remote antiquity, explaining the origin of the word "murder," than as the basis or origin of any modern rule of law. And Lord Holt, in the same opinion, adds: "It appears, that since the time of Bracton," (who had described murder to be distinguished from manslaughter only by being done secretly, *clanculo*,) "the notion of murder is much altered, and comprehends all homicides, whether privately or publicly committed, if done by *malice prepensed*." In the same elaborate opinion, Lord Holt states the law, it is believed, as it is now understood and practised. "Malice," he says, "is a design formed of doing mischief to another; *cum quis data opera male agit*, he that designs and useth the means to do ill is malicious." "He that doth a cruel act voluntarily doth it of malice prepensed. If one doth such a mischief on a sudden, that is malice prepensed; for, saith my Lord Coke, if it be voluntarily, the law will imply malice. Therefore, when a man shall, without any provocation, *stab another with a dagger*, or knock out his brains with a bottle, this is express malice; for he designedly and purposely did him the mischief. This is such an act that is malicious in the nature of the act itself, if found by a jury, though it be sudden, and the words *ex malitia præcogitata* are not in the verdict." Kelyng, 127.

And in the opinion of the judges, in *Oneby's case*, in 1727, 2 Ld. Raym. 1487, they say, "without entering into a nice examination of the several definitions or descriptions of murder, as they are found in the old law books of Bracton, Britton and Fleta, where the wickedness of the act is aggravated by the

circumstances of secrecy or treachery; murder has been long since settled to be the voluntary killing a person of malice prepense, and that whether it was done secretly or publicly."

An instance of arbitrary presumption, created by positive law, by an English statute, designed to prevent the growing evil of infanticide, in certain cases enacted that, if a woman should conceal the birth of her bastard child, and afterwards the child should be found dead, it should be presumed that the child was born alive, and that she killed it. This statute was afterwards repealed.

But if we are right in tracing the principle and the true ground of the rule, which seems to be so well established by authority, it is not like an artificial presumption, established by positive law, on considerations of policy; nor like an arbitrary edict of an invading sovereign, jealous of his newly conquered and still exasperated subjects; but an instance of an inference, drawn by correct reasoning, from facts proved, which must stand until controlled or rebutted by some other fact proved. That such is the principle and foundation of this rule, I have offered some standard authorities to prove; and it remains only to show how uniformly this rule has been repeated, and enforced and acted upon, both by judges, and text writers of established authority.

I have already cited the leading passage in Foster's Crown Law. But the principle is recognized, rather than formally stated, in various passages of that work. "I have already premised, that whoever would shelter himself under the plea of provocation must prove his case to the satisfaction of his jury. The presumption of law is against him, till that presumption is repelled by contrary evidence." p. 290. And again, in p. 313: "for all voluntary felonious homicide without a provocation is undoubtedly murder."

Lord Hale says, "when one voluntarily kills another without any provocation, it is murder; for the law presumes it to be malicious, and that he is *hostis humani generis.*" 1 Hale P. C. 455. In 1 Hawk. *c.* 31, § 32, it is laid down, that "wherever it appears that a man killed another, it shall be

intended, *primâ facie*, that he did it maliciously, unless he can make out the contrary, by showing that he did it on a sudden provocation, &c." In 4 Bl. Com. 201, it is said, "we may take it for a general rule, that all homicide is malicious, and of course amounts to murder, unless where justified, excused, or alleviated into manslaughter; and all these circumstances of justification, excuse or alleviation, *it is incumbent upon the prisoner to make out* to the satisfaction of the court and jury; the latter of whom are to decide whether the circumstances alleged *are proved* to have actually existed; the former, how far they extend to take away or mitigate guilt." In 1 East P. C. 224, 340, it is laid down, that "the fact of killing being first proved, the law presumes it to have been founded in malice, unless the contrary appear; and all the circumstances of accident, necessity or infirmity, are to be satisfactorily proved by the prisoner, unless they arise out of the evidence produced against him. Upon the truth of these facts, so alleged, the jury alone are to decide; but whether, taking them to be true, the homicide is justified, excused or alleviated, is matter of law, upon which the jury ought to be guided by the direction of the court." The law is stated, in nearly the same terms, in 1 Russell on Crimes, (1st. ed.) 614–616. It is there said, that "it is incumbent upon the prisoner to make out such circumstances" of alleviation, &c. The following books are to the same effect. Bac. Ab. Murder, C. 2. 2 M'Nally, 546. 2 Stark. Ev. 948. Archb. Crim. Pl. (1st. ed.) 212, 213. 3 Chit. Crim. Law, (4th Amer. ed.) 727. Roscoe Crim. Ev. (2d ed.) 20, 653. 1 Gabbett Crim. Law, 455.

In *The Queen* v. *Kirkham*, 8 Car. & P. 116, 117, Coleridge, J. says, " as soon as it is ascertained that one individual, in the possession of his reason, has wilfully taken away the life of another, the law's first presumption is, that the party is guilty of murder." " The law requires from him and will allow him to show that there were some mitigating circumstances, which alter the presumed character of the act."

I will cite only one other recent English case, to show how uniformly this rule of law is applied there, in like cases. In

*The King* v. *Greenacre,* 8 Car. & P. 35, the question was whether the offence was murder or manslaughter. The homicide was committed in secret. Lord Chief Justice Tindal told the jury thus: " There are several principles of law relating to this subject, one of which is perfectly clear, viz. that, where it appears that one person's death has been occasioned by the hand of another, *it behoves that other to show* from evidence, or by inference from the circumstances of the case, that the offence is of a mitigated character, and does not amount to the crime of murder."

This rule has been adopted and sanctioned, almost in the same terms, in this Commonwealth, and in several of the States. In *Commonwealth* v. *Phillips,* in this county, in the year 1817, Parker, C. J. thus laid down the law: " When a homicide is committed, the law implies malice. It is incumbent on the person who committed it to prove the absence of malice, by evidence produced in his defence ; or the proof may arise out of the evidence on the part of the government " Pamphlet report of Phillips's trial, p. 45.

So in New York ; *The People* v. *McLeod,* 1 Hill, 436 ; and in New Jersey. *The State* v. *Zellers,* 2 Halst. 243. So in Pennsylvania, by the common law. *Pennsylvania* v. *Honeyman, Bell, McFall* and *Lewis,* Addison, 148, 161, 257, 282. Since the statute of that State, passed in 1794, the burden of proof is on the government ; and unless the circumstances of malice are proved, it is murder only of the second degree. 1 Whart. Dig. (4th ed.) 327.

I have thus endeavored to establish the proposition, and it seems to be most abundantly proved, that when the fact of voluntary homicide is shown, and this not accompanied with any fact of excuse or extenuation, malice is inferred from the act ; that this is a fact which may be controlled by proof; but the proof of it lies on the defendant ; and if not so proved, it cannot be taken into judicial consideration. This is expressed in a variety of forms, a variety so great as to preclude the supposition that it depends upon a form of words or mode of expression transmitted by one writer or jurist to another but

recognized, for a long series of years, as a rule of judicial decision founded on the principles of evidence and confirmed by a long course of practice.

In *Legg's case,* the words are, " *it lieth upon the party indicted* to prove the sudden quarrel." So in *Oneby's case,* " where a man is killed, the law will not presume that it was upon a sudden quarrel, unless it is proved so to be." Foster says, the defendant " must *prove* his case to the satisfaction of his jury. The presumption of law is against him, *till it is repelled* by contrary evidence." Blackstone says, " it is *incumbent on the prisoner* to make out," &c. East says, the circumstances "are to be satisfactorily *proved by the prisoner.*" Starkie says, the defendant " must *prove* his case." Coleridge, J. says, " the law *requires from him to show,*" &c. Tindal, C. J. says, " *it behoves him* to show," &c.

These various expressions we consider as meaning substantially the same thing. Now, whether it be regarded as a presumption, to be rebutted by proof, or a change of the burden of proof, or an inference of fact, to be controlled or disproved by evidence, as applied to this subject, it makes little difference. It is evidence of malicious homicide, which must have its effect, until the malice is disproved by satisfactory proof of circumstances of extenuation. It is hardly necessary to cite authorities to the very familiar principle, that when a fact is to be proved, it must be by evidence sufficient to lead a jury to believe it to be true ; and that, for this purpose, it must outweigh or overbalance the evidence which it is brought to control. I will simply allude to two recent cases of great interest, in this court. In *Commonwealth* v. *J. F. Knapp,* 9 Pick. 496, the prisoner was charged with aiding and abetting in the murder of Mr. White. The proof tended to show that the prisoner conspired with the perpetrator of the murder, and was in a situation to afford encouragement and assistance, though standing at some distance from the scene. The court instructed the jury, that if the prisoner was one of the conspirators, and in a situation to afford some assistance, it would follow, as a legal presumption, that he was there to carry into

effect the concerted crime ; and that it would be for the pris oner to *rebut that presumption,* by showing to the jury that he was there for another purpose.

In *Commonwealth* v. *J. J. Knapp,* 10 Pick. 484, the principle is laid down more explicitly. The prisoner was charged as accessory before the fact to the same murder ; and it became necessary to prove the conviction of the principal. The record was offered for that purpose and objected to. The court admitted it as *primâ facie* evidence, saying, " it may be rebutted by showing that there was no murder, or that Francis was not in a situation where he could take a part as a principal. The prisoner has the burden of proof. He must show the jury that Francis ought not to have been convicted. He is not to make the propriety of the conviction *questionable* merely ; he must prove it to have been clearly wrong."

These cases, it is believed, were deliberately tried, and the rules of law laid down in them were much considered ; and the passages I have cited are directly in point. In both cases, it was held, that where a presumption against the accused was established, or a *primâ facie* case made, it must stand as a fact proved, till overthrown by proof of the contrary. In the last case, proof of murder committed, and the prior conviction of the principal, were essential averments to be proved ; but the record of the conviction was held *primâ facie* evidence of that murder, unless proved by the defendant to be wrong. Proof making it *questionable* would be insufficient.

This is precisely conformable to the direction, in the case at bar, that when the state of the proof is such, that it becomes necessary for the accused to take on himself the proof of a fact, it will not be sufficient to make it doubtful or questionable ; it must preponderate.

When it is said that the proof lies on the accused, it is not to be understood that the evidence must be adduced or offered by him ; he may avail himself of all the evidence, on both sides, whether produced by himself, or coming from the other side on direct or cross examination. The true meaning is, that the accused takes the responsibility of that fact, and if the

proof does not sustain it, the legal conclusion is that it is not true, and he cannot have the benefit of it, as a fact proved.

If it be still insisted, that conformably to this course of reasoning, a person on trial may be convicted of the higher offence when the jury have doubts whether he ought to be so convicted, we think the answer is obvious. The crime, the *corpus delicti*, is to be proved beyond reasonable doubt ; otherwise the accused is entitled to an acquittal. The jury must be so instructed, and were so instructed in the present case. If the homicide was proved beyond reasonable doubt, and no fact of extenuation came out with the proof of the homicide, (and we are now so to presume,) then the offence of which the party was convicted was proved beyond reasonable doubt, and the doubt arises only in regard to a fact which was alleged by the accused in extenuation, but not proved. This would, perhaps, appear more clear, in a case where there is no medium between acquittal and conviction, as there is in homicide, by a verdict of manslaughter. Suppose a party indicted for manslaughter, and that the defence should be excusable self-defence. Suppose the fact of killing should be clearly proved, but an attempt to prove a previous violent attack upon him by the deceased should fail, although the evidence might tend to raise some doubt whether there was not such previous attack. The conviction, in such case, must rest on proof establishing the *corpus delicti* beyond reasonable doubt, although the whole evidence would raise a doubt, whether there had not been such previous attack. The proof establishing the necessity for such taking of life, in self-defence, must be satisfactorily made out. Raising a doubt would be insufficient.

So in *J. J. Knapp's case*, the jury might have entertained great doubts of the correctness of the conviction of the principal ; but being established by proof, sufficient until met by proof sufficient to prove it incorrect, the jury were rightly directed to convict him, because such proof was not given.

The other branch of the direction given to the jury, that in case of the proof being equal, the presumption of innocence would turn the rule in favor of the prisoner, was favorable to

the accused, and could not be and has not been objected to by him. It may deserve a fuller consideration, when it again arises.

On the principal question, upon the fullest consideration we have been able to give it, on this revision, a majority of the court are of opinion that the direction was right, and that the motion for a new trial must be overruled.

WILDE, J. I regret exceedingly that the court have not been able unanimously to concur in opinion, on the important question raised by the motion of the prisoner's counsel. In the administration of justice, it is of great importance that the law and the rules of evidence should not only be founded upon just and reasonable principles, but that they also should be clearly settled. Any uncertainty of the law is a great evil, and may be productive of great injustice. This is true in all cases, civil or criminal, but more especially in capital cases, when the life of a fellow-being may depend on a principle of law or a rule of evidence.

Impressed with these considerations, and with the vital importance of the question in this case, I have examined the authorities on which it depends with great care and attention; and notwithstanding my great deference to the opinions of my learned brethren, in doubtful and difficult questions, I cannot conscientiously concur in the decision now pronounced by the Chief Justice. I am unable, after the most anxious consideration of the question, to overcome the strong conviction of my own mind, that the instructions excepted to are not maintainable upon any sound principle of law, or upon any binding authority. I feel therefore in duty bound to express my own opinion, and to refer briefly to the authorities and principles of law upon which it is founded.

In my opinion, the question depends entirely upon the rule of law as to the burden of proof. If the burden of proof, throughout the trial, was on the Commonwealth, the instructions to the jury were clearly incorrect; if, on the contrary, it was on the prisoner, after the proof of the homicide as charged, he has no ground of exception; as the instructions were more favorable to him than the law requires. That the

11 *

burden of proof was on the government, in the first instance, to prove all the essential facts alleged in the indictment, cannot be controverted; but the counsel for the Commonwealth contends, that the homicide having been proved as charged, the law presumes malice, and consequently that a *primâ facie* case for the government was fully proved, and thereupon the burden of proof shifted, and was thrown on the prisoner, to make it appear that the homicide was excusable, or was committed on such a provocation as would be sufficient to reduce the crime to manslaughter.

This argument cannot be maintained, unless the law of homicide, as to the burden of proof, is an exception to the well established rule of law in all other cases. Even in a civil suit, the plaintiff must prove all the essential allegations in his writ, beyond a reasonable doubt, or the defendant is entitled to a verdict. This just rule is of great importance in the trials of civil actions, where the evidence is doubtful; it is still more important in criminal trials, and most of all in capital trials. The *primâ facie* evidence of a case never changes the burden of proof, unless the defence is founded on the admission of the facts proved by such evidence. And in criminal cases, the burden of proof never shifts, so long as the defendant grounds his defence on the denial of any essential allegation in the indictment. For instance; if the prisoner, in the present case, had grounded his defence on the proof of an *alibi*, and the jury had doubted whether to believe the witnesses testifying to his guilt, or the witnesses testifying to an *alibi*, undoubtedly the jury would have been bound to return a verdict of acquittal, notwithstanding the government, in the first instance, had made out a *primâ facie* case by express evidence. And how can the principle vary when a *primâ facie* case is made out partly by presumption? If, on the whole evidence, the jury had a reasonable doubt of the prisoner's guilt as charged, they could not be justified in convicting him.

In the case of *Commonwealth* v. *Dana*, 2 Met. 329, the defendant was indicted for having in his possession lottery tick-

ets, with an intent to sell or offer them for sale ; and the jury were instructed that " if, from the whole evidence on the part of the Commonwealth, they were led to the belief that the defendant did sell and deal in lottery tickets, and had them in his possession for that purpose, they would be authorized to find him guilty, unless he had succeeded, on his part, as had become his duty, to explain those facts and circumstances consistently with his innocence of that unlawful intention." To this charge the defendant excepted, and the exception was overruled ; but not on the ground, as was understood by the counsel for the Commonwealth, that the burden of proof was thrown on him. The court say, " this is not the meaning of the charge ; for the jury were instructed that they were not authorized to find the defendant guilty, unless the evidence was such as to lead them to believe that he was guilty. The remark, that it was the duty of the defendant to explain the facts and circumstances proved against him, consistently with his innocence, meant no more than he ought so to do ; but still if he failed, they were not to find a verdict against him, unless, on the whole evidence, they believed him guilty. If they doubted, they were to acquit him. So the case was left to the jury on the right footing, namely, that the burden of proof was not shifted, but still remained on the Commonwealth, to prove the guilt of the defendant ; and if a reasonable doubt remained, the defendant was to be acquitted." The rule was thus laid down in *Powers* v. *Russell*, 13 Pick. 76, 77 : " When the proof on both sides applies to one and the same issue or proposition of fact, the party whose case requires the proof of that fact has, all along, the burden of proof. It does not shift, though the weight in either scale may at times preponderate. But where the party having the burden of proof gives *primâ facie* evidence of a fact, and the adverse party, instead of producing proof which would go to negative the same proposition of fact, proposes to show another and distinct proposition, which avoids the effect of it, there the burden of proof shifts, and rests upon the party proposing to show the latter fact." See

also *Sperry* v. *Wilcox*, 1 Met. 270, and *Brown* v. *King*, 5 Met. 181. Various other authorities might be cited in support of the rule laid down in these cases; but it is unnecessary. I consider the rule of law as clearly settled; and it is founded on the plainest principle of reason and justice. Most certainly, when a party is charged with the commission of any crime, all the facts constituting the crime must be proved against him; and if, on the whole evidence, the jury have a reasonable doubt as to any one of such facts, they are bound to acquit him. The jury are sworn to give a true verdict according to the evidence; not according to the presumption of any fact, unless it is a natural and reasonable inference from some other facts proved.

In the case of *Coffee* v. *The State*, 3 Yerg. 283, it was decided, that malice being a necessary ingredient in constituting the crime of murder, if the jury had a reasonable doubt of the malicious intent with which the act was done, that doubt must weigh in favor of the prisoner; and unless removed by the government, they must acquit him. " I am of opinion," says Green, J. " that the judge should have told the jury that if, upon the whole circumstances of the case, they were satisfied of his [the prisoner's] guilt, they ought to find him guilty; but if their minds, taking all the evidence together, could not come to any satisfactory conclusion as to whether the act amounted to murder or manslaughter, they ought to find him guilty of manslaughter only."

These principles and authorities are wholly irreconcilable with the presumption of malice on which the counsel for the Commonwealth relies. No malice can be inferred from the mere act of killing. Such a presumption, therefore, is arbitrary and unfounded. Many homicides are committed in self-defence, some by accident, and many more upon a sudden provocation, or in mutual combat. How then can it be maintained, upon any just or reasonable principle, that every homicide implies malice, unless the contrary be proved beyond a reasonable doubt? Nor is such a presumption supported, as it seems to me, by any binding authority. It had its origin in

a barbarous age, when the rules of evidence, as now established, were little known, or very much disregarded. Depositions of witnesses not permitted to be confronted with the prisoner, and written examinations of accomplices, and their confessions, proved by hearsay evidence, were all considered competent proof, by very learned judges, in the most solemn trials. Such was the unsettled state of the law, as to the admission and effect of evidence, when the presumption in question had its origin, and indeed for several centuries after. At that time, the crime of murder was confined to the secret killing of another, which the word *moerda*, says Judge Blackstone, signifies in the Teutonic language. "It was defined, *homicidium quod nullo vidente, nullo sciente, clam perpetratur ;* for which the vill wherein it was committed, or (if that were too poor) the whole hundred, was liable to a heavy amercement ; which amercement itself was also denominated *murdrum*. This was an ancient usage among the Goths in Sweden and Denmark ; and, according to Bracton, was introduced into this kingdom by King Canute, to prevent his countrymen, the Danes, from being privily murdered by the English ; and was afterwards continued by William the Conqueror, for the like security to his own Normans." 4 Bl. Com. 194, 195. The same account of these ancient laws is given by Lord Holt, in *Regina* v. *Mawgridge*, Kelyng, 122. Before the statute of Marlbridge, he observes, "if a man was found to be slain, it was always intended, 1st, that he was a Frenchman ; 2d, that he was killed by an Englishman ; 3d, that the killing was murder ; 4th, if any one was apprehended to be the murderer, he was to be tried by fire and water, though he killed him by misfortune ; which was extended beyond reason and justice in favor of the Normans." These ancient laws or ordinances were abolished by *St.* 14 Edw. 3, *c.* 4 ; since which, murder has been defined as it now is, "without regarding whether the party slain was killed openly or secretly, or whether he was of English or foreign extraction." 4 Bl. Com. 195. Staunf. P. C. 18. 1 Hale P. C. 447.

Such is the origin of the presumption relied on in support

Commonwealth *v.* York.

of the conviction of the prisoner ; a presumption founded on
no just principle, but on arbitrary ordinances which have
been long since abolished, and which is opposed to a funda-
mental and a most important principle of the criminal law, that
in all cases, where the guilt of the accused is left doubtful
by the evidence, the presumption of innocence is to prevai
in his favor.   And so, if it be doubtful whether he be guilty
of a greater or less offence, he is only to be convicted of the
latter.   But if the presumption of malice, from the mere act
of killing, had ever any foundation in justice or sound policy,
it must be confined to secret homicides, as it was originally,
and cannot be extended to cases where the facts and circum-
stances attending the homicide are proved, and the existence
of malice, from the whole evidence, is left doubtful.

On principle, this appears to me exceedingly clear ; and I
think there is no binding authority to the contrary.   The
*dicta* of judges, referred to in the digests, were extrajudicial.
They are to be found in cases decided on special verdicts,
where the question of malice depended upon the facts and
circumstances found by the jury, from which it might or
might not be inferred.   Such was the decision in *The King*
*v. Oneby,* 2 Ld. Raym. 1485, and 2 Stra. 766.   There was no
question as to the burden of proof in that case ; for the ques-
tion of malice was expressly decided on the facts found by the
jury.   The court say, that " upon the trial of an indictment
for murder, the judge directs the jury thus : ' If you believe
such and such witnesses, who have sworn such and such
facts, the killing the deceased was with malice prepense ex-
press, or it was with malice implied ; and then you ought to
find the prisoner guilty of murder ; but if you do not believe
those witnesses, then you ought to find him guilty of man-
slaughter only : and so, according to the nature of the case, if
you believe such and such facts, the act was deliberate or
not deliberate ; and then you ought to find so and so.'   And
the jury may, if they think proper, give a general verdict,
either that the prisoner is guilty of murder, or of manslaugh-
ter.   But if they decline giving a general verdict, and will

find the facts specially, the court is to form their judgment, from the facts found, whether there was malice or not, or whether the fact was done on a sudden transport of passion, or was an act of deliberation or not." 2 Ld. Raym. 1494. From these principles it must be inferred, that whatever may have been the opinion of the court as to the presumption of malice, from the mere act of killing, in cases of secret homicides, they were nevertheless of opinion, that when there was evidence as to the manner of killing, and the facts and circumstances attending the act, the question of malice was to be decided upon those facts and circumstances, whether decided by the jury, or by the court upon the facts specially found. Now, if the jury, in the present case, had found a special verdict in conformity with the instructions of the court, it would have been, that the prisoner was guilty of the homicide charged; but whether it was committed with malice prepense, or in the heat of blood on some provocation, or in mutual combat, was doubtful, although, by the preponderance of the evidence, the crime was committed with malice. It is very clear that such a verdict could not be received, as no judgment could be rendered upon it; a material fact not having been found. And this I consider a test of the soundness of the presumption contended for in behalf of the prosecution. For if the burden of proof is on the prisoner, to reduce the crime from murder to manslaughter, and the jury find that he has failed so to reduce it by satisfactory evidence, but that the presumption of malice and the preponderating proof concur, the court would be authorized to sentence the prisoner as convicted of the crime of murder; which I hold clearly the court would have no authority to do.

If then there is any ground for the presumption in question in cases of secret homicides, there is none whatever in cases where there is evidence as to the facts and circumstances accompanying the act of killing. In all such cases, the jury are to decide upon the question of malice, according to the facts and circumstances proved. Malice is implied, says Sir Michael Foster, when the fact of killing "hath been attended with such circumstances as carry in them the

plain indications of an heart regardless of social duty and fatally bent upon mischief." And all the authorities agree, that when such facts and circumstances are proved, the law implies malice; which certainly is a just and reasonable implication. But why is malice implied from facts and circumstances indicating a wicked and depraved heart, when malice is presumed from the mere act of killing? If the secrecy of the act may raise the presumption of malice, such a presumption has no application to cases in which the facts and circumstances accompanying the act are proved; and no case can be found, in which such a presumption has been so applied. This presumption of malice, from the mere act of homicide, is not sanctioned either by Lord Coke or Lord Hale. Lord Coke lays down the doctrine, as to the implication of malice, very fully. Malice, he says, is implied in three cases: 1st. In respect of the manner of the deed; as if one killeth another without any provocation of the part of him that is slain, the law implieth malice. 2d. In respect of the person slain; as the killing of an officer in the due execution of his duty. 3d. In respect of the person killing; as if A. assault B., to rob him, and in resisting, A. killeth B., this is murder by malice implied. 3 Inst. 52. The same doctrine is laid down by Lord Hale. "When one voluntarily kills another *without any provocation,* it is murder; for the law," says he, "presumes it to be malicious, and that he is *hostis humani generis.*" 1 Hale P. C. 455. Neither of these eminent judges and learned writers on criminal law takes notice of any presumption of malice from the mere act of homicide.

On the other hand, it is true that Sir Michael Foster, an eminent judge certainly, and a learned writer on criminal law does lay down, in his discourse on homicide, the doctrine of presumption as now contended for on behalf of the Commonwealth. But the only case cited in support of the doctrine is *The King* v. *Oneby,* which was decided on a special verdict upon the facts and circumstances accompanying the killing, and not on any presumption of malice from the act itself. This opinion of Sir Michael Foster, which has principally

given currency to the doctrine contended for by the counsel for the Commonwealth, is supported only by a few *dicta* of judges, which, as it seems to me, are founded on no just principle. Blackstone, in his commentaries, says, "all homicide is presumed to be malicious, until the contrary appeareth upon evidence." 4 Bl. Com. 201. But Foster's discourse on homicide is alone cited in support of the presumption. East, in his treatise, cites Foster and Hale ; but the latter, as already remarked, does not support the doctrine. 1 East.P. C. 224. Russell, in his treatise, lays down the same rule of presumption, but cites only Blackstone in its support. 1 Russell on Crimes, (1st ed.) 615. Roscoe on criminal evidence cites East & Hale, and also 8 Car. & P. 35. But the case in Car. & P. was one of secret homicide, and there was no evidence that the prisoner was the guilty party, except from his own statements. In the same volume, p. 22, (*The King* v. *Morrison,*) a prisoner was indicted and convicted of manslaughter, simply on his admission, on being arrested, that he was the person who killed the deceased. Park, J. in his instructions to the jury, said, "the death of man, if it be shown to have been occasioned by the prisoner, will be murder or manslaughter, as the circumstances may turn out, unless it is shown by the prisoner to have been occasioned by accident." And this is the doctrine contended for by the prisoner's counsel, in the present case. In this case, the facts and circumstances accompanying the homicide were proved, and the jury were bound to decide the question, whether the crime were murder or manslaughter, according to the evidence, without any regard to the presumption relied on in support of the prosecution.

Taking into consideration all these authorities and *dicta*, and the statements of the law of homicide by the writers on criminal law, I am of opinion that the following conclusions are maintained on sound principles of law and manifest justice : 1. That when the facts and circumstances accompanying a homicide are given in evidence, the question whether the crime is murder or manslaughter is to be decided upon the evidence, and not upon any presumption from the mere act

of killing.    2. That if there be any such presumption, it is a presumption of fact, and if the evidence leads to a reasonable doubt whether the presumption be well founded, that doubt will avail in favor of the prisoner.    3. That the burden of proof, in every criminal case, is on the Commonwealth to prove all the material allegations in the indictment ; and if, on the whole evidence, the jury have a reasonable doubt whether the defendant is guilty of the crime charged, they are bound to acquit him.    And, consequently, that the instructions to the jury, in the present case, on the question of malice, were erroneous.    In my opinion, the jury should have been instructed, that the burden of proof was on the government, and that the prisoner could not be legally convicted of the crime charged, unless they were convinced, beyond a reasonable doubt, that he was in fact guilty of that crime ; that a preponderance of the evidence, if a reasonable doubt remained, was not sufficient ; and that the question of malice was to be decided on the facts and circumstances accompanying the homicide, and not on any presumption from the mere act of killing.

I am therefore constrained to say, with great deference to the opinion of my learned brethren, that, in my judgment, the prisoner is entitled to a new trial.