THOMPSON, Circuit Judge.
Words are slippery things. Take “malice,” its legal definitions alone can encompass: the intent to commit a wrongful act, reckless disregard for the law, ill will, wickedness of heart, and the intent to kill. See Black’s Law Dictionary 968-69 (7th ed.1999). But can malice’s fifty shades of meaning include “improper motive?” Former flight attendant Nancy Gray, convicted of providing false information regarding a bomb threat on an airplane, seeks to convince us that she was denied a fundamentally fair trial when her jury was instructed that malice meant “evil purpose or improper motive.” Because we find that the district court’s definition just won’t fly, we vacate Gray’s conviction and remand this case for a new trial.
I.
BACKGROUND
A. Bomb on Board
By September of 2009, Nancy Gray had been an American Airlines flight attendant *461 for over ten years. On September 30, she was scheduled to work Flight 1318 from Boston to Miami. That afternoon, Gray and the rest of the flight crew boarded and began their pre-flight safety checks as the cabin service crew cleaned the aircraft.
Cabin service crew member John Mari-no worked his way from the back of the plane to the front, cleaning first the rear lavatories, then the middle lav before finishing with the first class lav. This task included restocking the dispensers with paper towels, tissues, and toilet paper. To restock the paper towels, Marino had to unlatch and open a small door to access the storage area behind the towel dispenser. When he opened that door in the middle lav on Flight 1318, Marino did not see anything written on the inside of the door. While Marino was finishing up in the first class cabin, he saw a female flight attendant (Gray) enter the middle lav, and come out again.
Gray then hurried over to the lead flight attendant and told him that she had found a note in the middle lav. Together they went back to the lav, where the lead flight attendant saw, written on the inside of the storage compartment door, the words “Bomb on Board! BOS-MIA.” They then rushed to the cockpit to notify the captain. Pre-boarding had begun, and by the time they returned to the middle lav with the captain, it was occupied by a passenger. Once he could enter the lav, the captain saw the message and decided to stop boarding and notify the authorities.
The aircraft was evacuated and towed to a remote area of Logan Airport where, over a period of several hours, it was searched. No bomb was found.
B. The Confession
On December 15, 2009, Gray, whose job .was suspended at the time, contacted FBI Special Agent Joseph DeVuono at his office at O’Hare International Airport to request an interview to “clear her name.” They arranged to meet at DeVuono’s office on the morning of December 23. Gray arrived at around 9:30 a.m., carrying “a very large sized soft drink.” DeVuono offered her a cup of coffee, which she declined, but at her request, he bought her a chocolate bar. Gray met with DeVuono and Special Agent David Mertz for an hour and a half before taking a break. At the break, Gray — who had been sipping the soda and eating the candy bar during the interview — sought and received permission to test her blood sugar level.[1] Gray showed the agents that her blood sugar was 106, and indicated that it was a good number and that she felt fine.
Gray next met with Special Agent Jay Cherry, who interviewed her for approximately two hours.[2] DeVuono then rejoined Gray and conducted a final hour and a half interview, during which she wrote and signed the following confession:
After careful consideration and with deep regret and remorse I take blame for writing on the door on Sept 30, 2009 Boston to Miami. The codes BOS-MIA were already on the door. I did not have anything to do with any other threats made, ever to American Airlines. After I did it I realized what I had done. I have been under extreme, stressful *462 personal things in my life. After the ground worker called me a “fucking bitch” I snapped for a moment. I care deeply about AA, crew & the passengers. I have loved my job & still do. I will never do it again. To clarify what I wrote “Bomb on board!” It was wrong. I’m truly sorry. I never want a 9-11 to happen again and I did it more to get the ground workers in trouble than cause what I did.
She left the FBI office at 3:45 p.m., and according to DeVuono, she did not appear impaired or disoriented. According to her then-husband, Scot Brewer, when Gray returned home around 5:30 p.m., “she was walking funny, talking in slurred speech” and asking to see her mother, who had died ten years earlier. Brewer gave her sweet tea and a PopTart and “she slowly started to come back around.”
C. The Trial
On August 5, 2010, a grand jury indicted Gray for giving false information regarding a bomb threat on an airplane in violation of 49 U.S.C. § 46507(1).[3] Gray pled not guilty.[4]
During the four-day trial that ensued, the government introduced Gray’s signed confession into evidence, and elicited testimony from the FBI Special Agents, American Airlines employees, and several crew members of Flight 1318 about the bomb hoax incident and subsequent investigation. Flight Attendant Stacy Hyde testified to a possible motive, saying that Gray was “very upset with” American Airlines’s handling of a medical issue she’d had. On direct examination, Hyde recalled that, previous to the day of the flight, Gray had told her “that she was going to, ‘Get back at them.’ ” During cross-examination, Hyde was shown the statement she made to a state police officer immediately following the bomb hoax. At that time, she did not report that Gray said she’d “get back at” American Airlines. Rather, she quoted Gray as saying “They’ll never be able to fire me, I’ll have to quit.”
Gray’s ex-husband, Dr. Brewer, testified that Gray seemed incoherent and disoriented when he spoke to her after she left her FBI interview.[5] Gray did not take the stand.'
D. The Jury Instructions
Both Gray and the government submitted proposed jury instructions. Because the statute she was accused of violating requires the government to prove that Gray wrote the threat “knowing the information to be false, willfully and maliciously or with reckless disregard for the safety of human life,” both parties offered instrue *463 tions defining “maliciously.” 49 U.S.C. § 46507(1). Citing Sand’s Modern Federal Jury Instructions — Criminal ¶ 13.04, Instruction 13-24, Gray suggested the definition: “[t]o act maliciously means to do something with an evil purpose or motive.” Citing United States v. Gullett, 75 F.3d 941, 947 (4th Cir.1996), the government offered “[t]o act maliciously means to ‘act[] intentionally or with willful disregard of the likelihood that damage or injury would result.’ ”
The district court conducted a charging conference, during which the government pointed out that this circuit has never defined malice in the context of § 46507. The government argued that absent any legislative history, the common-law definition the government had offered was the better standard. Nevertheless, the court determined that it would “sharpen” the instruction by including the definition of malice offered by the defense. The court then instructed the jury, saying:
And then we turn to the question of what we call “malice,” “willful or malicious conduct.” To act maliciously in this context means to do something with an evil purpose or motive. It means to do something that is knowingly wrong, and here suggestions have been made that Ms. Gray had some malice toward American Airlines. But the [government has to prove that and you have to evaluate it. (emphasis added).
At the conclusion of jury instruction, the court held a sidebar conference and the government objected to the definition of malice, arguing that the jury didn’t need to find motive at all, that evil intent was sufficient. The court noted that “evil purpose or motive” was phrased in the disjunctive, and added “I understand the objection. I think I am going to leave it where it is.” However, after sidebar, the court again addressed malice, telling the jury “what ‘malice’ means is to act with an evil purpose or an improper motive, that is ‘or,’ and it is up to you to decide whether or not the circumstances under these conditions, if you find them, constitute either acting with an evil purpose or acting with an improper motive.” (emphasis added). Defense counsel asked for a sidebar and pointed out that “I think under [Sand’s Modern Federal Jury Instruction] it’s ‘evil purpose or evil motive.’ ‘Improper purpose [sic]’ I think lessens the burden.” The court replied “No, it doesn’t,” and the jury was sent to deliberate.
An hour and twenty minutes later, the jury sent a note back with a question: “What are the 4 criteria ... to consider for a verdict (e.g. malice)?” The court noted to the attorneys that defense counsel was concerned about the use of the word “improper” and asked counsel “what, assuming that I am going to respond more specifically about ‘malice,’ do you want?” Defense counsel continued to argue for “evil purpose or motive.” The court offered its own definition and, after some discussion, defense counsel asked for a brief break to review the relevant cases.[6] The court agreed, and suggested that, so the jury could keep working, it would send back just the four elements under the statute, and would wait to “see if they ask more about ‘maliciously.’ ” Both parties agreed. Twenty-five minutes later, the jury returned, not with a question, but *464 with a verdict — guilty. Gray was sentenced to twenty-seven months in prison, with three years of supervised release. This timely appeal followed.
II.
DISCUSSION
Gray makes several arguments on appeal, but one we find dispositive.[7] She argues that the district court erred by instructing the jury that “malice could be an improper purpose, thus reducing the government’s burden of proof.” The government counters that Gray’s argument “should be deemed waived,” and that in any event, the court’s instruction was correct.
A. Waiver
The government asserts that Gray offers us only a “skeletal, perfunctory argument” about the definition of malice. We have often stated that “we deem waived claims not made or claims adverted to in a cursory fashion, unaccompanied by developed argument.” Rodriguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir.2011). We require parties to “spell out their issues clearly, highlighting the relevant facts and analyzing on-point authority.” Id. Specifically, parties “must give us the ‘raw materials’ ... so that we can do our work.” Id.
Here, Gray offered a short but on-point argument in her opening brief, citing to the Fourth Circuit’s decision in United States v. Hassouneh, 199 F.3d 175, 182 (4th Cir.2000), for the proposition that “evil purpose or motive ... more accurately reflects the proper legal standard necessary to convict a person of acting ‘maliciously’ ” under the analogous Bomb Hoax Act, 18 U.S.C. § 35. She outlined for us the sequence of events during jury instruction, and provided a transcript of the proceeding. She further developed her argument in her reply brief, and during oral argument, she focused entirely on this single issue. Therefore, we find the argument has been sufficiently developed and is not waived.
B. Jury Instruction
We proceed, then, to the question of whether the court’s second attempt at defining malice — “to act with an evil purpose or improper motive” — was error. “Preserved claims of instructional error are assessed on appeal under a bifurcated framework.” United States v. Sasso, 695 F.3d 25, 29 (1st Cir.2012). “[W]e consider de novo whether an instruction embodied an error of law, but we review for abuse of discretion whether the instructions adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues.” United States v. Symonevich, 688 F.3d 12, 24 (1st Cir.2012) (internal quotations omitted). Gray’s claim of instructional error involves the district court’s amended definition of the malice element in 49 U.S.C. § 46507(1), engendering de novo review. See Sasso, 695 F.3d at 29.
The government asserts that, where a statute does not define a common-law term like malice, courts presume that Congress adopted the common-law definition of that term. See Morissette v. United States, 342 *465 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952). The government had offered such a common-law definition in its proposed jury instruction: to “act intentionally or with willful disregard of the likelihood that damage or injury would result;” and now argues that the amended instruction given by the district court is the substantive equivalent of that definition. Gray, on the other hand, proposed the definition found in Sand’s Modern Federal Jury Instructions for violations of both § 46507(1) and the analogous Bomb Hoax Act, 18 U.S.C. § 35(b) which states, “To act ‘maliciously’ means to do something with an evil purpose or motive.” Sand’s Modern Federal Jury Instructions-Criminal ¶ 13.04, Instruction 13-24. In order to determine which definition of malice to adopt to best reflect Congressional intent, we must analyze the reasoning behind the conflicting definitions.
“[Wjhere a federal criminal statute uses a common-law term of established meaning without otherwise defining it, the general practice is to give that term its common-law meaning.” United States v. Bayes, 210 F.3d 64, 68 (1st Cir.2000) (quoting United States v. Turley, 352 U.S. 407, 411, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957)). This is the approach taken by the Eighth Circuit in United States v. Sweet, 985 F.2d 443, 445 (8th Cir.1993). In a brief opinion involving the analogous § 35(b) charge,[8] the Eighth Circuit upheld a district court’s instruction defining “maliciously” as acting “intentionally or with willful disregard of the likelihood that damage or injury will result.” Id. In doing so, it declined with little explanation the defendant’s proposal that the definition should include the words “evil purpose or motive.” Id.
However, we will not presume a common-law meaning if there are “grounds for inferring any affirmative instruction from Congress” to define it otherwise. Morissette, 342 U.S. at 273, 72 S.Ct. 240. This is the tack followed by the Fourth Circuit in a case also involving the related statute, the Bomb Hoax Act. The Fourth Circuit found that an instruction including the “evil purpose or motive” component “more accurately reflects the proper legal standard necessary to convict a person of acting ‘maliciously’ under § 35(b).” Hassouneh, 199 F.3d at 182. In reaching this conclusion, the court examined the legislative history of the Bomb Hoax Act to divine Congress’s intent. Id. at 179-80. Because the statute at issue here is very similar to § 35, it is worth reviewing that history.
Prior to its amendment in 1961, 18 U.S.C. § 35 was a misdemeanor statute that punished those who willfully and knowingly imparted false information concerning a bomb threat. Id. at 179. In 1961, the Act was amended to delete the word “willfully” and incorporate the remaining language into the new subsection (a). Id. at 180. At the same time, subsection (b) was added to make it a felony to convey false information about a bomb threat “willfully and maliciously or with reckless disregard for the safety of human life.” Id. at 180 (quoting 18 U.S.C. § 35(b)).
The Hassouneh court noted that the amended statute indicated “a congressional intent to subject anyone who provides false information of the type proscribed in the statute to punishment, but to punish those who make such statements ‘willfully and maliciously, or with reckless disregard for the safety of human life’ more severely.” Id. at 180. As further evidence of this intent, the court cited an Executive Communication from the United States Attorney General to the Speaker of the *466 House of Representatives, made at the time the statute was amended to provide for the separate penalties, which explained that the earlier statute had created “judicial confusion over the applicability of the statute in prankster cases.” Id. (quoting United States v. White, 475 F.2d 1228, 1233 n. 6 (4th Cir.1973) (quoting 1961 U.S.Code Cong. & Admin. News, p. 3053)). In proposing the amendment that created separate penalties, the Attorney General stated,
I submit to the Congress a bill which would make it a felony for one to convey a false report willfully and maliciously, or with reckless disregard for the safety of human life, and a misdemeanor to do so with knowledge of its false character even though without malice or reckless disregard for human life. Such a statute would clearly show the congressional intention to make it a criminal offense to give false reports even without an evil or reckless motive and would provide a more- adequate penalty for those whose actions warrant it.
Id. (emphasis added). In his explanation of the need for the amendment, the Attorney General thus equated the felony standard “willfully and maliciously, or with reckless disregard” with “evil or reckless motive.” Accordingly, in deciding that the defendant’s proffered “evil purpose or motive” instruction more accurately reflected the proper legal standard, the Fourth Circuit found that there were “considerable grounds for inferring that Congress intended a meaning of ‘maliciously’ different from the common law definition.” Id. at 182.
Section 46507 and § 35 are very similar, as noted by Sand when he chose to select the Fourth Circuit’s definition of malice as more appropriate to violations of § 46507(1). Both statutes provide two separate penalties for those who convey false information about bomb threats in aviation. Just as § 35(a) describes a civil penalty and § 35(b) a felony, 49 U.S.C. § 46302(a) is a civil penalty for knowingly providing false information about a bomb threat, while § 46507(1) is a felony for providing the false information about the threat “willfully and maliciously.”
Like Sand, we find the Fourth Circuit approach more persuasive. To repeat, “when Congress uses a common law term and does not otherwise define it, it is presumed that Congress intended to adopt the common law definition.” United States v. Patterson, 882 F.2d 595, 603 (1st Cir.1989). However that presumption is overcome here when we consider the statutory scheme as a whole. The only difference between § 46302(a) and § 46507(1) is the addition of the words “willfully and maliciously.” If “maliciously” means “intentionally,” as the common law definition states, then two redundancies would be created. First, as Hassouneh explains, there would be no difference between the two provisions, despite their very different penalties. See 199 F.3d at 182. Second, a redundancy would result between “willfully” and “maliciously” internal to § 46507(1).
“It is ... a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute.” Williams v. Taylor, 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal quotation marks omitted). The dissent favors a common law definition of malice that “specifically requires committing the wrongful act without justification, excuse, or mitigation.” United States v. Serawop, 410 F.3d 656, 664 (10th Cir.2005) (citing 50 Am.Jur. Homicide 2d § 37 (1999)). Were we to adopt this definition, we would not be adequately giving effect, to the distinct mens rea of “willfully.” As the district court *467 explained, willfully means “that a person acted deliberately and intentionally; it was not done inadvertently or mistakenly. It was done on purpose as opposed to accidentally or carelessly or unintentionally.” The only distinction between this and the dissent’s definition of malice are the words “without justification, excuse, or mitigation.” We do not believe that is sufficient to reflect Congress’s intent.[9] See Hassouneh, 199 F.3d at 181 (noting that “maliciously” was added to 18 U.S.C. § 35(b) because “willfully” by itself “does not necessarily embrace any evil purpose but comprehends merely a voluntary and conscious imparting or conveying of the false information with which the statute deals”) (internal quotation marks omitted).
We believe Sand’s definition, on the other hand, is more in line with Congressional intent. The history of § 46507(1) reveals that its statutory precursor, 49 U.S.C. § 1472(m), was modeled after § 35. United States v. Irving, 509 F.2d 1325, 1328-29 (5th Cir.1975). The wiser course then, given how closely related the two statutes are, is to follow Sand’s approach and define malice in the context of both § 35(b) and § 46507(1) as “evil purpose or motive.”
We recognize that there are multiple common law definitions of malice.[10] The dissent favors a common law definition that is frequently used to distinguish manslaughter from murder. See Serawop, 410 F.3d at 664. The Seventh Circuit, on the other hand, recently upheld another common law definition of “maliciously” as “[acting] intentionally or with deliberate disregard of the likelihood that damage or injury will result.” United States v. Grady, 746 F.3d 846, 848 (7th Cir.2014) (addressing the definition of maliciously within the context of the federal arson statute). The Grady court stated that this definition is “indeed a common definition of the word,” is found in the Fourth, Eighth and Eleventh Circuit model jury instructions, and “is how the common law traditionally defined the term.” Id. at 849. Furthermore, the Grady court explicitly rejected the dissent’s position that “malice” must include the phrase “without just cause or reason.” Id. It is clear there is no “one size fits all” common law definition of malice. That said, we find “evil purpose or motive” to be a closer fit within the context of § 46507(1).
There are a couple of other reasons to favor Gray’s proposed definition. “[Statutes which relate to the same subject matter should be considered together so that they will harmonize with each other and be consistent with their general objective scope.” Rathbun v. Autozone, Inc., 361 F.3d 62, 68 (1st Cir.2004) (inter- *468 nal quotation marks omitted). We should construe 18 U.S.C. § 35(b) and 49 U.S.C. § 46507(1) in pari materia because they proscribe the same conduct and are very similarly worded. See United States v. Cothran, 286 F.3d 173, 178 (3d Cir.2002) (stating that “ § 35(b)’s language closely tracks that of 49 U.S.C. § 46507”).
Finally, to the extent the definition of malice under § 46507(1) may be ambiguous, “the rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.” United States v. Santos, 553 U.S. 507, 514, 128 S.Ct. 2020, 170 L.Ed.2d 912 (2008) (applying the rule of lenity to adopt the defendant’s proposed definition of “proceeds” in a statute as “profits”). Because Sand’s definition raises the bar for the government, it favors the defendant. We hold that Gray’s proposed instruction, from Sand, defining malice in the context of § 46507(1) as “to do something with an evil purpose or motive,” is the appropriate definition.
Having determined that Gray’s proffered definition was legally correct, we do not stop there. Had the district court allowed its original definition to stand, we wouldn’t be here. But alas, the court amended its definition to include “or improper motive.” Because “the district court has considerable discretion in how it ... words its jury instructions,” United States v. Gonzalez, 570 F.3d 16, 21 (1st Cir.2009), we must now determine whether the instruction given conveyed the correct definition of malice, or if, as Gray contends, it diluted the meaning of the word.[11]
The government argues the three words are close enough to Gray’s requested definition because they “conveyed the same meaning.” Because jury instructions demand somewhat greater precision than that required by horseshoes and hand grenades, we’ll assess this argument to see if the court’s definition of malice was correct or merely close, but no cigar.
The government claims that “[t]he word ‘improper’ imparted a sense of deliberate wrongfulness above and beyond a reckless disregard for the law, which is precisely the idea conveyed by Gray’s requested ‘evil purpose or motive’ instruction.” We must disagree. The word improper carries several meanings, not one of which is the equal of evil.[12] The universe of things that are considered improper would encompass anything from wearing a hat indoors to filing a frivolous lawsuit. Evil, on the other hand, is more commonly used to describe something that is morally reprehensible. It should go without saying that the words are not interchangeable.
We faced a similar situation in United States v. Tobin, 480 F.3d 53, 55-56 (1st Cir.2007). In Tobin, we addressed a jury instruction that defined “harassment” in the context of telephone calls as using the phone “in a way that is not meant as a *469 good faith effort to communicate ... and is done with an unjustifiable motive.” Id. at 55. We held that “[t]he district court’s ‘bad faith-improper motive’ instruction” would include the charged conduct (harassing phone calls), but “would also include almost anything else of which the jury might disapprove.” Id. at 57. The same danger exists here. The court’s definition allowed the jury to convict Gray if it found that she was improperly motivated by something it frowned upon. This diluted the willful and malicious element, and lowered the government’s burden considerably. Notably, it resulted in a standard lower than the “willful disregard” instruction proposed by the government.
The district court’s instruction was not nearly close enough. Instead, its definition diluted the meaning of malice to an impermissibly low standard.[13]
C. Harmless Error
Our analysis does not end with the determination that the instruction was erroneous. “Even an incorrect instruction to which an objection has been preserved will not require us to set aside a verdict if the error is harmless.” Sasso, 695 F.3d at 29. We employ “two barometers for measuring harmless error in a criminal case.” Id. Issues of a constitutional dimension require the government to “prove beyond a reasonable doubt that the error did not influence the verdict.” Id. (quoting Chapman v. California, 386 U.S. 18, 23-24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). If, however, the error is found to be of a non-constitutional dimension, a less stringent standard applies to allow a conviction to stand “as long as it can be said ‘with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.’ ” Id. (quoting Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).
Although Gray characterizes the incorrect jury instruction as depriving her of a fundamentally fair trial, she offers us no more than that. She does not present a constitutional argument, does not even hint at a standard of review for harmless error, does not address the question of prejudice, and seems to ask us to simply presume prejudice from the erroneous instruction. Similarly, the government provides us with no harmless error analysis.
As for what standard of review to apply, Sasso provides guidance. 695 F.3d at 30. The court in Sasso had erred by offering the jury a definition of “willfully” that diluted the level of scienter required by the statute under which the defendant had been charged. Id. In that case, we determined that the error was of the non-constitutional variety, requiring us to apply the less stringent standard to determine whether the judgment was “substantially swayed by the error.” Id. at 29 (quoting Kotteakos, 328 U.S. at 765, 66 S.Ct. 1239). We will do the same here.
In reviewing the record, arguably the only evidence of malice was the statement in the confession: “I did it more to get the ground workers in trouble than cause what I did,” and the testimony of Flight Attendant Hyde that Gray told her that she was *470 upset with American Airlines and would “Get back at them.” The jury could have considered the full text of the confession, which included Gray’s statement that she “eare[d] deeply about AA, crew & the passengers,” and concluded that she may have intended some benign mischief toward a co-worker, rather than intending behavior evidencing evil intent. As to Hyde’s testimony, the jury could have weighed her damning statement on the stand, and contrasted it with the more innocuous account she gave immediately following the incident to conclude that Gray bore no evil intent. Yet the jury could reasonably have deemed these intentions as improper. We therefore cannot say with fair assurance that the judgment was not substantially swayed by the error.
The government had the burden of proving that Gray wrote the bomb threat willfully and maliciously. The proof of motive was less than compelling, and Gray’s motivation was debatable. The court’s incorrect definition of malice — “evil purpose or improper motive” — impermissibly diluted the standard and introduced “too great a likelihood that the instructional error may have influenced the verdict.” Sasso, 695 F.3d at 31. Our review of the record convinces us that the error was not harmless.
CONCLUSION
The district court’s jury instruction was erroneous, and Gray was prejudiced by the likelihood that the diluted standard may have influenced the verdict. Consequently, we vacate the conviction and remand for a new trial in accordance with this opinion.

. There is some dispute over the question of whether Gray had been diagnosed with diabetes. Defense counsel agreed that she would not use the word “diabetes'' at trial, although the issue of “blood sugar levels’’ did come ' before the jury.

. Although not mentioned at trial, during this interview Gray took a lie detector test, which was administered by Cherry.

. 49 U.S.C. § 46507 provides for a term of imprisonment of not more than five years if an individual “knowing the information to be false, willfully and maliciously or with reckless disregard for the safety of human life, gives, or causes to be given, under circumstances in which the information reasonably may be believed, false information about” a bomb threat on an airplane.

. Gray filed a motion to suppress her confession, and attached an affidavit which alleged that she had been coerced into signing a false confession. The government opposed the motion, and on the first day of her jury trial, Gray withdrew it.

.Gray sought to offer her ex-husband’s testimony that he tested her blood sugar level when she returned home from the FBI interview and saw that the monitor showed a reading of 52, a level he felt was dangerously low. Gray argues that the district court erred in ruling that Dr. Brewer (a dentist) was not an expert and could not testify about testing Gray’s blood sugar, and the significance of the level he read. However, because we are vacating her conviction on other grounds, we need not address that argument.

. The court offered: “malice in its legal sense characterizes all acts done with an evil disposition, a wrong and unlawful motive and purpose, the willful doing of an injurious act without lawful excuse.” This definition was based on that of Chief Justice Shaw in Cornmonwealth v. York, 50 Mass. 93, 9 Met. 93, 105 (1845). The government was "content” with that definition, but suggested that no additional definition of malice needed to be supplied.

. In addition to challenging the court's decision to bar expert testimony by Brewer, Gray argues that the prosecutor permitted false testimony when two eye witnesses contradicted their earlier statements. She further asserts that the district court erred by advising the jury that she had a right against self-incrimination, and by imposing a two-point sentencing enhancement for obstruction of justice. As previously stated, we do not reach these arguments.

. We will explore the similarities between these two statutes shortly.

. Footnote 1 of the dissent implies that "a defendant who makes a knowingly false bomb threat in an effort to obtain help from law enforcement while being held hostage” could be found guilty of the civil penalty version of the crime — and not the felony version — because he made the threat "willfully” but not "maliciously.” However, Congress never intended to apply the civil penalty to individuals who are justified in making false bomb threats. Rather, the civil penalty was created to prosecute "pranksters.” Cf. Hassouneh, 199 F.3d at 181 (stating that “the statute seems to contemplate that many pranksters whose poorly developed senses of humor lead them to make statements prohibited by § 35 will be subject to the civil penalty.”). Moreover, such an individual would likely be able to raise a strong justification affirmative defense. See, e.g., Dixon v. United States, 548 U.S. 1, 8, 13-14 & n. 7, 126 S.Ct. 2437, 165 L.Ed.2d 299 (2006); United States v. Leahy, 473 F.3d 401, 405-09 (1st Cir.2007).

. The dissent suggests that our decision in Hernandez-Cuevas v. Taylor, 723 F.3d 91 (1st Cir.2013), supports its "settled” common law definition of malice. To the contrary, Hernandez-Cuevas recognized that "[c]ommon law malice standards vary by jurisdiction and context.” 723 F.3d at 102 n. 11.

. Although this is the first time the definition of malice has been addressed within the context of § 46507, our sister circuits have addressed incorrect definitions of malice in the context of homicide, and have granted relief where the definition offered by the court impermissibly lowered the standard or shifted the burden of proof to the defendant. See Caldwell v. Bell, 288 F.3d 838, 844 (6th Cir.2002); United States v. Wharton, 433 F.2d 451, 456 (D.C.Cir.1970).

. Improper has been defined as “[ijncorrect; unsuitable or irregular,” Black’s Law Dictionary 761 (7th ed.1999); "not in accordance with truth, fact, reason, or rule; abnormal, irregular; incorrect, inaccurate, erroneous, wrong,” Oxford English Dictionary, available at http ://www. oed. com/view/Entiy/92817; and "not in accord with propriety, modesty, good manners, or good taste,” Merriam-Webster Online Dictionary, http://www.merriamwebster.com/dictionary/improper.

. Section 46507 prohibits giving false infer-' mation about a bomb threat “willfully and maliciously or with reckless disregard for the safety of human life” (emphasis added). This disjunctive phrasing provides two bases for conviction — the jury could have found that Gray had not acted willfully and maliciously, but had acted recklessly. However, where “one of the possible bases of conviction was legally erroneous” and "it is impossible to tell which ground the jury selected,” we must set aside the verdict. United States v. Nieves-Burgos, 62 F.3d 431, 436 (1st Cir.1995).